Deyonne WALKER, Nan Peacock,
and Neil Hansen, Petitioners,

v.

WEBER COUNTY, Respondent.

No. 981561.

Supreme Court of Utah.

Oct. 2, 1998.

Duncan T. Murray, Ogden, for petitioners.

David C. Wilson, Christopher Allred, Robert R. Wallace, Watts–Baskin, for respondents.

ZIMMERMAN, Justice:

This matter comes before us alternatively as a petition for extraordinary relief or as a motion to amend ballot title. Petitioners are three persons who submitted a petition to the Weber County Clerk–Auditor with over 10,000 voters' signatures and proposed for the ballot the question of whether the voters should change the Weber County form of government from the Commission Form to the County Executive–Council Form, as permitted by Utah Code Ann. section 17–35a–101, *et seq.*, known as the Optional Forms of County Government Act.[1]

The petition was certified as sufficient to the Weber County Commission, and on May 14, 1998, the Commission directed that the proposal be placed on the ballot for the upcoming election on November 3, 1998. The Commission had no discretion in deciding whether to put the matter on the ballot under section 17–35a–204(1) of the Utah

---

1. The numbering of the sections was changed effective May 4, 1998. However, the substantive provisions in question have remained unchanged in all material respects.

Code.[2] Utah Code Ann. section 17–35a–203(2) prohibits the Commission from changing any particulars of the proposal.[3] Similarly, Utah Code Ann. section 17–35a–204(3) gives the Weber County Commission little discretion in describing the matter for the ballot. The Commission is to

> prepare the ballot for each election [on a proposal for changing the form of county government] so that the question on the ballot:
>
> (a) clearly, accurately, and impartially presents the proposition to be voted on; and
>
> (b) does not constitute an argument or create prejudice for or against the proposition.

Utah Code Ann. § 17–35a–204(3) (Supp. 1998). In furtherance of this duty, the Weber County Attorney provided the Commission with a draft of a description of petitioners' proposal at a Commission meeting on September 8, 1998. This proposal, termed a "ballot title," was approved with one change on September 10th. Petitioners appeared at both meetings and objected that the statement was an unfair description of the proposal and was designed to discourage voters from voting for the proposed form of county government. The Commission made no significant changes in response to the petitioners' objections.

Petitioners promptly filed the present proceeding in this court, asking that we review the ballot title and require that it be modified because it unfairly characterizes the proposal and is biased against the proposal. Petitioners claim that under section 20A–7–608(4) of the Code,[4] we have authority to review the ballot title and rewrite it to meet the statutory criteria for clarity, accuracy, and impartiality. That section, which pertains to initiative measures in general, specifically gives this court jurisdiction to review initiative ballot titles and correct them. Alternatively, petitioners contend that although the Optional Forms of County Government Act, section 17–35a–101, *et seq.*, does not specifically authorize this court to review ballot titles, we should exercise our general extraordinary writ power under rule 65B of the Utah Rules of Civil Procedure and rule 19 of the Utah Rules of Appellate Procedure and effectively

---

2. Section 17–35a–204(1) provides:

> The county legislative body *shall* hold an election if an optional plan is proposed:
>
> (a) by a resolution adopted under Subsection 17–35a–202(2)(e);
>
> (b) in a petition filed under Subsection 17–35a–203(2)(a) that is certified under 17–35a–203(4)(a)(ii)(A); or
>
> (c) in a study committee report filed under Subsection 17–35a–303(3)(d).

Utah Code. Ann. § 17–35a–204(1) (Supp.1998) (emphasis added).

3. (a) Registered voters of a county may file a petition requiring the county legislative body to submit a proposed optional plan to the registered voters of the county.

> (b) Each petition under Subsection (2)(a) shall:
>
> (i) be signed by registered voters residing in the county equal in number to at least 15% of the total number of votes cast in the county at the most recent election for governor;
>
> (ii) contain a general description of the proposed optional plan;
>
> (iii) indicate that a complete copy of the proposed optional plan is available for inspection and copying at the county clerk's office;
>
> (iv) designate up to five of the petition signers as sponsors, one of whom shall be desig-

nated as the contact sponsor, with the mailing address and telephone number of each; and

> (v) be filed in the office of the clerk of the county in which the petition signers reside.
>
> (c) Before circulating a petition under Subsection (2)(a) for signature, the petition sponsors shall file with the county clerk at least three complete copies of the proposed optional plan that is the subject of the petition.
>
> (d) *A county legislative body may not alter an optional plan proposed under this Subsection (2).*

Utah Code Ann. § 17–35a–203(2) (Supp.1998) (emphasis added).

4. Section 20A–7–608(4) provides:

> (a) If the ballot title furnished by the local attorney is unsatisfactory or does not comply with the requirements of this section, at least three of the sponsors of the petition may, by motion, appeal the decision of the local attorney to the Supreme Court.
>
> (b) The Supreme Court shall examine the measures and hear arguments, and, in its decision, shall certify to the local clerk a ballot title for the measure that fulfills the intent of this section.
>
> (c) The local clerk shall print the title verified to him by the Supreme Court on the official ballot.

perform the same sort of review authorized expressly for initiative measures by section 20A–7–608(4). Weber County has opposed the petition on several grounds, both procedural and substantive. We address the procedural issues first and then the substance of the ballot title.

First, the County contends in its papers that this court lacks jurisdiction to consider the petition. It argues that the express jurisdictional grant in title 20A–7 does not apply here because that title deals generally with initiative proposals for legislation, while title 17–35a, which contains no such direct jurisdictional grant, deals specifically with the procedures for changes in the form of county government. Since the specific controls over the general, the County's papers contend that title 17–35a gives us no power to directly review the ballot title. As for petitioners' alternative contention that we should exercise our discretion and grant an extraordinary writ in the nature of mandamus, the County in its papers argues that petitioners should first apply to the district court for declaratory relief as a precondition to invoking our appellate jurisdiction.

■ At oral argument, the County persisted in its claim that we have no jurisdiction under title 20A–7 but withdrew its objections to this court taking jurisdiction over this matter under rule 65B and rule 19, principally because the election is close and requiring petitioners to go to the district court would effectively preclude timely relief. We accept the County's concession and agree to take jurisdiction of this petition under Utah Rule of Appellate Procedure 19, which authorizes this court to entertain writ proceedings under rule 65B in appropriate circumstances. We conclude that the lateness of the County's adoption of the ballot title—some four months after the Commission was informed that the petition was qualified for inclusion on the ballot and less than two months before the election, when combined with its unwillingness to disclose the proposed ballot title to petitioners before September 8th—operated to make it practically impossible for petitioners to proceed first to the district court and then appeal to this court. This is a suitable case for exercising our writ jurisdic-

tion. For this reason, we have no occasion to decide the question of whether we also have jurisdiction under title 20A–7.

Moving to the merits, petitioners contend that the ballot title is written so as to discourage voters, most of whom will be informed about the proposed new form of government only from the ballot title, from voting for the change. Petitioners have several general complaints about the drafting, and a number of detailed proposals. As to the standard by which this court should review the drafting of the ballot title, petitioners contend that we should not grant the County broad discretion in determining how to present the proposal to the voters. The County Commission opposes the change and allowing the County broad latitude in how it describes the proposal that it opposes would be, petitioners argue, like giving the fox broad discretion over the henhouse. Instead, petitioners urge us to review the ballot title with the same close scrutiny section 20A–7–608(4) authorizes us to exercise regarding initiative proposals.

The County responds that it should be given broad discretion and that even if we think that the ballot title is not as well written or as impartial as it might be, we should not rewrite it absent a clear abuse of discretion.

Rule 65B(c), which applies here, says little that bears on the standard by which we review the County's action, other than to say that a ground for relief is a claim that a public official has "unlawfully" exercised the authority of their office. This language is an oblique reference to our case law on the availability of a writ to compel a public official to perform their duty. That case law suggests generally that in an extraordinary writ proceeding in the nature of mandamus, we review the alleged failure of governmental officials to perform their duties under an abuse of discretion standard. In other words, we determine only whether the officials have so exercised their discretion that it can be said that they have failed to do what the statute requires, or have done something which the statute does not permit. *See Renn v. Utah State Bd. of Pardons*, 904 P.2d 677 (Utah 1995); *Olson v. Salt Lake City School*

*Dist.,* 724 P.2d 960 (Utah 1986). It is this case law that the County relies upon and petitioners seek to avoid.

■ In deciding the approach to take here, it may be less important to state the abstract standard by which we review the Commission's action than to look closely at the statute delineating the Commission's duty. For if the statute imposes a very specific duty on the Commission, then even an abuse of discretion standard will not provide the Commission much real latitude. Here, the statute charges the County Commission to prepare the ballot title "so that the question on the ballot: (a) clearly, accurately, and impartially presents the proposition to be voted on; and (b) does not constitute an argument or create prejudice for or against the proposition." This standard is a very strict one. It is interesting to note that this standard is similar to but even more rigorous than that contained in section 20A–7–608(2), the title applicable generally to initiative measures and the statute under which petitioners alternatively seek relief from us.[5] For example, section 20A–7–608 requires that the local attorney preparing the ballot title give a "true and impartial" statement of the purpose of the measure, "to the best of his ability." It also states that the ballot title "may not intentionally be an argument, or likely to create prejudice, for or against the measure." Thus, under that section, the capabilities and intentions of the drafter of the ballot title are relevant to whether the result meets the statute's purposes. But under section 17–35a–204(3), the County Commission is given no such leeway. Its drafting skill and its intentions are in fact irrelevant. The statute imposes an objective requirement that the ballot title *actually* be clear, accurate, and impartial in its presentation of the proposal and that it not create prejudice for or against the proposal.

■ In light of the strictness of the statute, we think that even an abuse of discretion standard requires that we afford the Commission little latitude in conforming to its requirements. The statutory test is not whether the Commission has tried to be fair and accurate and impartial in writing the ballot title: the test is whether it has achieved that goal. We have reviewed the ballot title before us and find that it does not meet that standard. As will be explained below, there are several generic problems with the ballot title that cause it to miss the mark. However, this court will not follow the course proposed by petitioners and undertake to redraft the ballot title, as we apparently would be required to do under section 20A–7–608. Rather, we trust that the Commission, once advised of the standard by which its product must be judged will rewrite the ballot title in good faith and as the statute requires. Therefore, we undertake only to describe generally the short-

---

5.  Section 20A–7–608 provides:

(1) Whenever a referendum petition is declared sufficient for submission to a vote of the people, the local clerk shall deliver a copy of the petition and the proposed law to the local attorney.

(2) (a) The local attorney shall:

(i) prepare a ballot title for the referendum; and

(ii) return the petition and the ballot title to the local clerk within 15 days after its receipt.

(b) The ballot title may be distinct from the title of the law that is the subject of the petition, and shall express, in not exceeding 100 words, the purpose of the measure.

(c) The ballot title and the number of the measure as determined by the local attorney shall be printed on the official ballot.

(d) In preparing ballot titles, the local attorney shall, to the best of his ability, give a true and impartial statement of the purpose of the measure.

(e) The ballot title may not intentionally be an argument, or likely to create prejudice, for or against the measure.

(3) Immediately after the local attorney files a copy of the ballot title with the local clerk, the local clerk shall serve a copy of the ballot title by mail upon any of the sponsors of the petition.

(4) (a) If the ballot title furnished by the local attorney is unsatisfactory or does not comply with the requirements of this section, at least three of the sponsors of the petition may, by motion, appeal the decision of the local attorney to the Supreme Court.

(b) The Supreme Court shall examine the measures and hear arguments, and, in its decision, shall certify to the local clerk a ballot title for the measure that fulfills the intent of this section.

(c) The local clerk shall print the title verified to him by the Supreme Court on the official ballot.

comings of the ballot title and instruct the County Commission to redraft it. The Commission should promptly provide a copy of that draft to petitioners so that they can seek further review if necessary.

We now discuss the proposed ballot title, which is set forth in a footnote with the proposed emendation sought by petitioners indicated in legislative style.[6] We include petitioners' changes not because we think they are necessary for any fair and accurate presentation of the proposal, but because they highlight the places where the parties disagree on the ballot title's fairness and accuracy.

■ Petitioners' first general complaint is that the ballot title not only describes the changes that would be made by the proposal, but also emphasizes facts that are characteristics of the *present* form of county government (facts which most voters may not be aware of and which they might view with suspicion on first reading), permitting the inference that those characteristics will come about only under the *new* form of government. For example, the ballot title recites the powers of the new County Executive as "budget officer, personnel director and to supervise the official conduct and duties of the County's elected and appointed officers." This suggests an amassing of authority in the executive area of county government that would be new. But the authority of the County Executive over other elected and appointed county officers, for example, would be no greater than that currently exercised by the County Commission. And, of course, the present County Commission exercises both the powers of the executive *and* the legislative branches, powers that will be split between the new County Executive and the County Council under the proposal. A similar problem is presented by the flat statement that the Executive will be the "personnel director," which does not convey the fact that the new County Council will have the power to review the Executive's appointments. Plainly, the ballot title statement does not "clearly, accurately, and impartially" present the proposition, as it must. At the same time, its exampled statements in the ballot title are likely to create prejudice against the proposition.

---

6. BALLOT ~~ISSUE~~ TITLE ~~MODIFICATION~~ CHANGE IN FORM OF WEBER COUNTY GOVERNMENT

**Shall the present form of Weber County Government consisting of ~~three~~ full time County Commissioners ~~and seven other elected officials~~ be changed to a "County ~~Executive Council~~ Executive–Council Form" ~~consisting of fifteen elected officials~~ as specified below?**

~~If approved, the~~ The proposed change would become effective January 1, 2001, and would change the present form of County Government by replacing the three-member full time County Commission, which is elected at large, with a full time County Executive and a seven-member part time County Council. ~~It would modify the present~~ The new form ~~of~~ would retain the other elected positions in Weber County, ~~government by replacing the three full time County Commissioners, elected at large~~ with the ~~a County Executive elected at large~~ same authority (Assessor, Attorney, Clerk–Auditor, Recorder, Sheriff, Surveyor, and ~~a seven member part time County Council elected from specific districts within the County~~ Treasurer). The ~~modified form would retain the seven other elected positions in Weber County (Assessor, Attorney, Clerk–Auditor, Recorder, Sheriff, Surveyor, and Treasurer).~~ ~~The part time~~ County Council would be vested with all legislative and policy-making powers of the County including enactment of tax levies, ordinances, and adoption of the budget. The County Council could override a veto by the County Executive with the affirmative vote of five of the seven County Council members. County Council members would be elected from County Council districts for ~~four years~~ four-year terms, except that initial terms would be staggered.

The ~~full time~~ County Executive would be ~~elected at large for a four-year term by all voters in the County and would be~~ the budget officer, ~~personnel director and supervise the official conduct~~ would make appointments upon the advice and ~~duties~~ consent of the ~~County's elected~~ County Council, would have executive authority to carry out programs and policies established by the County Council, and ~~appointed officers~~ would have more (limited) supervisory authority over other executive officials than the current County Commission. The County Executive would have veto power over ordinances and line item veto power over budgets passed by the County Council. ~~To override a veto~~ The County Executive would ~~require an affirmative vote of five of the seven Council members~~ be elected at large for a four-year term.

~~To adopt the new form of County Government as outlined above, punch the hole next to the word "YES"~~ YES-___

~~To retain the current form of County Government, punch the hole next to the word "NO"~~ NO-___

A variant of this problem is the recitation that the form of county government will go from "three full time County Commissioners and seven other elected officials" to one with "fifteen elected officials." While it may be technically true, describing the number of full time officials under the current form of government (ten) and then mentioning that there will be fifteen under the new form without observing in the same plan in the ballot title that only eight of them will be full time is less than a fair portrayal of the proposal and appears calculated to discourage voters who are wary of proliferating bureaucracies from voting for the new form.

Having noted specific ways in which this ballot title does not meet the rigorous standards set by section 17–35a–204(3), we conclude that the preparer of the ballot title—the County Commission—has not fulfilled the duties imposed upon it by the statute. Accordingly, we order the Weber County Commission to forthwith redraft the ballot title so that it "clearly, accurately, and impartially presents the proposition to be voted on," with care that the resulting title not "constitute an argument or create prejudice for or against the proposition." In so doing, the Commission should act with the recognition that the ballot title is to describe, not characterize, the changes that the proposition would effect in the form and operation of county government when compared with the current form of government. The legislature plainly contemplated that the public was to have the choice of forms of county government. The legislature also contemplated that no matter how much the current county government may oppose a change, it must present it to the public as drafted. And although the Commission is charged with preparing the ballot title, it *must* describe the proposal to the voters with the utmost fairness and accuracy. Otherwise, the choice the legislature intended the people to have could easily be defeated by those who stand to lose the most personally from any change.

The Weber County Commission has seven days from the date of this order within which to prepare a new ballot title, present it to petitioners, and consider it for adoption.

HOWE, C.J., DURHAM, Associate C.J., and RUSSON, J., concur in Justice ZIMMERMAN's opinion.

STEWART, J., does not participate herein.